IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,

          Plaintiff,

v.

ARTURO LEDESMA, JR.,

          Defendant.

Case No. 3:18-CR-30103-NJR-7

## MEMORANDUM AND ORDER

ROSENSTENGEL, Chief Judge:

On the morning of May 13, 2018, a trooper with the Illinois State Police pulled over a gray Nissan Rogue with Pennsylvania license plates headed east on Interstate 55 in Madison County, Illinois. The vehicle was traveling under the speed limit, yet hit the brakes and made a sudden lane shift when the driver noticed the officer's marked vehicle on the side of the road. The vehicle reeked of marijuana and a masking scent, and the occupants were nervous. They were rubbing religious artifacts, which the trooper, Nate McVicker, recognized as symbols that were supposed to give drug couriers good luck and safety on their journey. When questioned separately, their stories did not match. Trooper McVicker searched the vehicle and found a vacuum-sealed bag containing thousands of dollars in the center console. He also noticed a hidden compartment running along the floorboard. That compartment held 32.2 pounds of methamphetamine and a loaded Glock.

The driver, Enrique Vazquez, told McVicker he was a drug runner, and he was being paid by someone else to drive drugs from Arizona to Pennsylvania. He told McVicker he was a college student at Phoenixville University in Arizona, and that another vehicle involved in drug trafficking had been following him on the interstate. Those statements were lies—Vazquez was

not a college student or drug runner—he was the head of a drug-trafficking organization (DTO). His passenger, Mitchell Abreu, was a friend and drug courier for Vazquez.

Eight others ultimately were arrested in connection with the DTO: Jeremy Inderyas, the middleman; Angel Martinez, a spiritual advisor who was paid to try to get Abreu to "take the case" for Vazquez; Emmanuel Vazquez, Enrique's brother and local drug distributor; Jansel Abreu, a fugitive who accepted shipments and repackaged drugs for Vazquez; Rory Burkholder, who received and distributed large quantities of drugs for Vazquez; Lauren Korn, Inderyas's girlfriend; Dastisha Velez, Vazquez's wife; and Arturo Ledesma, Jr., who sold marijuana to Inderyas and connected Vazquez to a source of methamphetamine. (Doc. 627).

All Defendants except Ledesma and Jansel Abreu, who remains a fugitive, pleaded guilty to their respective charges. Ledesma exercised his right to a trial by jury on his two counts— conspiracy to distribute and possess with intent to distribute controlled substances, namely, marijuana and 500 grams or more of methamphetamine (Count 1) and possession with intent to distribute over 500 grams of methamphetamine as an aider and abettor (Count 2). (Doc. 316). Trial began on May 31, 2022, and ended on June 8, 2022, with a verdict of guilty on Count 1 and not guilty on Count 2.

Ledesma now moves the Court for judgment of acquittal notwithstanding the verdict or, alternatively, a new trial. (Doc. 584). For the reasons set forth below, the Court grants the motion and enters a judgment of acquittal. Alternatively, should the Court of Appeals disagree, the Court finds that Ledesma is entitled to a new trial.

### THE EVIDENCE AT TRIAL

The following evidence, viewed in the light most favorable to the Government, was presented at trial.

In June 2016, Enrique Vazquez got out of prison for criminal homicide and needed to

make money. (Doc. 629 at p. 90-91). Vazquez worked at a barber shop and then in residential home care before deciding to sell drugs. (*Id.* at p. 92). He first bought marijuana from a supplier in his home state of Pennsylvania but later turned to a childhood friend who lived in California, Jeremy Inderyas. (*Id.* at p. 92-93). Vazquez reached out to Inderyas through social media, and Inderyas told Vazquez he could sell him marijuana. (*Id.* at pp. 93-94).

Inderyas had been selling marijuana since 2011 or 2012 in California and believed it eventually would be legalized throughout the country. (Doc. 630 at p. 224). When Inderyas and his girlfriend, Lauren Korn, first moved to California from the East Coast, they lived in a house with several other people. (Doc. 631 at p. 135). One of those people was Ledesma's cousin, Amy. (*Id.*). When Amy found out that Inderyas and Korn were looking for marijuana, she introduced them to Ledesma. (*Id.*). Inderyas told Ledesma that he had buyers out east. (*Id.*). Beginning around November 2013, Inderyas and Ledesma started a "business relationship" that continued for years. (*Id.* at p. 135-36).

Once Inderyas agreed to sell marijuana to Vazquez in 2017, the arrangement worked like this: Vazquez would either mail payment for the marijuana to Inderyas or deposit it into a Wells Fargo bank account owned by Inderyas's girlfriend, Lauren Korn. (*Id.* at p. 133-34). Inderyas and Korn would then withdraw the money, purchase the marijuana, and ship it by U.S. Mail to Vazquez in Pennsylvania. (*Id.*). Inderyas mailed Vazquez marijuana at least five to 10 times between 2017 and 2018, and each shipment was about two to five pounds. (*Id.*). Inderyas purchased marijuana from different people, but many times he got it from Ledesma. (Doc. 630 at pp. 225-26). Inderyas and Korn would either meet Ledesma in Santa Cruz or Monterey County, California, or sometimes Ledesma would stop by their house in Sacramento. (*Id.* at p. 227). On at least two occasions, Korn deposited money from her Wells Fargo account into Ledesma's Wells Fargo account. (*Id.* at p. 137).

At some point in 2017, Vazquez told Inderyas he wanted to start selling methamphetamine (Doc. 630 at p. 230). Inderyas called Ledesma to see if he could get methamphetamine, as he knew Ledesma had family in Mexico that dealt with "heavier drugs and stuff like that." (*Id.* at p. 231). Vazquez and his wife, Dastisha Velez, traveled to California to meet with Inderyas and Ledesma. (*Id.*). While at Ledesma's house, they all smoked marijuana while Ledesma made phone calls to try to get a pound of methamphetamine for Vazquez. (*Id.* at p. 232). A couple of hours later, they drove into town and met in a parking lot to complete the transaction. (*Id.*). Vazquez paid Ledesma in cash and shipped the methamphetamine back to Pennsylvania. (Doc. 629 at p. 104-05). Once Vazquez and Velez returned to Pennsylvania, Vazquez broke the meth into smaller quantities to sell for a profit. (*Id.* at p. 105-06). Vazquez did not buy any more methamphetamine from Ledesma, however, because he was unhappy with the quality of it. (*Id.*). Instead, he obtained methamphetamine from two suppliers in Mexico that he had met in prison. (Doc. 630 at p. 152-54). Vazquez continued to have Inderyas serve as his middleman. (*Id.*).

Vazquez testified that he bought methamphetamine from his suppliers in Mexico "a bunch of times." (Doc. 629 at p. 107). At first, the methamphetamine was mailed to him, but later he had a towing service ship a vehicle with a secret compartment filled with cash to Inderyas in California. (*Id.*). Inderyas would receive the car, take the money out of the compartment, get the methamphetamine, package it up, and send the car back to Pennsylvania. (*Id.* at p. 109). Other times, Vazquez had his runner, Mitchell Abreu, drive the car back and forth from Pennsylvania to California. (*Id.* at p. 113).

Ultimately, Vazquez was not happy with the price of this methamphetamine; it was too expensive, and he wasn't making enough profit. (*Id.* at p. 114). Vazquez told Inderyas to speak to Ledesma again to find a cheaper supplier of methamphetamine. (*Id.*). Inderyas was afraid he

would lose his marijuana business with Vazquez if he was not able to secure a cheaper source of methamphetamine. (Doc. 630 at p. 236). Inderyas tried to find a source for methamphetamine locally, but he was unsuccessful. (Doc. 631 at p. 139). He then contacted Ledesma a number of times, but Ledesma initially refused before finally agreeing to make a deal happen. (*Id.*). Inderyas ensured Vazquez that he could cut Ledesma out of the picture and deal directly with Ledesma's cousins so that Vazquez would not take his money elsewhere. (Doc. 630 at p. 244). Inderyas wanted to keep Vazquez's business. (*Id.*).

Vazquez agreed to travel to California in May 2018 to purchase 25 to 30 pounds of methamphetamine. (*Id.* at p. 28). Vazquez and Abreu began driving to California on May 8, 2018, with $70,000 in the car's secret compartment. (*Id.* at p. 28-29). At 6:44 p.m., Inderyas texted Vazquez to say that Ledesma's "peoples said LA or AZ would be better for them," which Vazquez took to mean that Ledesma's source wanted to meet in Los Angela or Arizona. (*Id.* at p. 36). Forty minutes later, Inderyas texted Vazquez: "Phoenix, bro!" (*Id.* at p. 38).

The morning of May 9, 2018, Vazquez let Inderyas know they were back on the road. (*Id.* at p. 42). Inderyas responded, "A super hype," which Vazquez testified meant that Art was super excited. (*Id.* at p. 43). Vazquez and Inderyas continued to text each other about getting hotel rooms in Phoenix, and Inderyas told Vazquez that Ledesma had "hit me up like five times today already making sure we are still a go." (*Id.* at pp. 44-45). Inderyas also told Vazquez he would bring his vacuum sealer. (*Id.* at p. 47). Vazquez testified that a vacuum sealer would be used to hide the odor of the meth and compress it. (*Id.*).

The next morning, May 10, 2018, Vazquez and Abreu continued driving to Phoenix. (*Id.*). Vazquez told Inderyas he would be there around 6 or 7 p.m. (*Id.*). Inderyas told Vazquez that he was "super Gucci with [Art's] cousin too, so he gonna link me with him, too. After this he said he don't have to come down himself no more." (*Id.* at p. 49). Inderyas testified that this meant he

would deal directly with Ledesma's cousin after this purchase of methamphetamine. (*Id.* at p. 256).

Vazquez and Abreu arrived in Phoenix on the evening of May 10, 2018. (*Id.* at p. 50). The transaction was set for 2 p.m. the next day. (*Id.* at p. 51). On May 11, 2018, Vazquez and Abreu met with Inderyas, Korn, Ledesma, and Ledesma's friend at a LaQuinta Inn in Phoenix. (*Id.* at p. 55). From there, they went to Ledesma's friend's house, where everyone but Korn went inside. (*Id.*).

Around 10 p.m., Ledesma's cousin, Primo, arrived at the house in a white van. (*Id.* at p. 63). Vazquez and Primo negotiated a price for the 16 pounds of methamphetamine that Primo brought with him. (*Id.* at p. 64). Inderyas and Ledesma took their profit from the cash Vazquez brought, and the rest was given to Primo. (*Id.* at p. 65). After he was paid, Primo brought the methamphetamine inside. (*Id.* at p. 66-67). Because Vazquez was hoping to purchase more than 16 pounds, Primo then left and came back with another 14 or 15 pounds of methamphetamine. (*Id.* at p. 68). Vazquez testified that Inderyas and Vazquez resealed the methamphetamine multiple times to hide the odor, while Inderyas testified that he, Vazquez, Abreu, and Ledesma all helped seal the bags of methamphetamine inside additional vacuum-sealed bags. (*Id.* at p. 267). Inderyas then loaded the methamphetamine into the car's secret compartment. (*Id.* at p. 268). After the transaction was complete, Vazquez, Abreu, Inderyas, and Korn went back to the LaQuinta Inn before Vazquez and Abreu headed to Pennsylvania. (*Id.* at pp. 72-73).

Next came the stop by Illinois State Trooper McVicker on Interstate 55 in Madison County, Illinois, on May 13, 2018. (Doc. 629 at p. 19). Again, McVicker noticed an overwhelming odor of marijuana through the vehicle and heightened anxiety from Vazquez and Abreu. (*Id.* at p. 21). They also gave inconsistent accounts of their travel plans once they were questioned separately. (*Id.* at pp. 22-23). At that point, police searched the vehicle and found $8,241 in United States

currency. (*Id.* at p. 58). The roadside search also uncovered a secret compartment running the length of the floorboard. (*Id.* at p. 25). Police towed the vehicle to a tow yard, where they were able to unlatch the compartment and uncover a loaded, fully automatic firearm and 32.2 pounds of methamphetamine. (*Id.* at pp. 55-59). Agents also seized five cell phones from the vehicle. (*Id.* at p. 34).

Vazquez and Abreu were arrested, and Vazquez was taken to a jail in Collinsville, Illinois. (*Id.* at p. 77). At the jail, Vazquez called his wife and, among other things, told her to call Ledesma to give him a heads-up that he had been arrested. (*Id.* at p. 85). His wife, Velez, never called Ledesma. (Doc. 631 at p. 79). Vazquez also told Velez to continue to collect money from people who owed him. (Doc. 630 at p. 85). Vazquez admitted he paid another man, Angel Martinez, $10,000 to try to bribe Abreu to be the fall guy and take the case for him. (*Id.* at pp. 144-45).

When Inderyas found out Vazquez had been arrested, he got rid of his cell phone and moved back to New York with Korn. (Doc. 630 at p. 269). Inderyas began using several new aliases after Vazquez's arrest; he previously had used the name Ramon Lopez, Jr., and even had a California's driver's license, a medical marijuana card, and a permit to grow 99 plants in California under that name. (*Id.* at pp. 271-76). Korn told the DEA during an interview that Vazquez and Inderyas said they were going to blame everything on a guy named Art. (Doc. 631 at p. 200). Velez also impliedly asked Korn if Inderyas could kill Abreu. (*Id.* at p. 203).

On June 7, 2018, Vazquez and Abreu were indicted by a grand jury with one count of conspiracy to distribute methamphetamine and one count of possession with intent to distribute methamphetamine. (Doc. 29). Vazquez also was charged with possession of a machinegun in furtherance of a drug trafficking crime and possession of a weapon by a felon. (*Id.*). As the investigation continued, a total of nine defendants were charged in the alleged conspiracy.

At trial, in addition to the above evidence, the jury heard testimony from Anastasia

Petruncio, a senior forensic specialist with the DEA who examined evidence for latent prints. (Doc. 630 at p. 192). Petruncio testified that she was able to develop 27 latent fingerprints from the food-saver bundles used to package the methamphetamine in this case. (*Id.* at p. 206). Petruncio was able to connect six prints to Inderyas and seven prints to Jose Humberto Ayah Gamboa. (*Id.* at p. 28). She made no positive identifications as to Ledesma. (*Id.*). Inderyas testified that he saw Ledesma wearing gloves while they were sealing the methamphetamine, but admitted he did not mention anything about Ledesma wearing gloves during his two proffer sessions with the Government. (*Id.* at p. 267; Doc. 631 at p. 22).

Joshua Hunt, a detective with the Collinsville Police Department, also testified. (Doc. 631 at p. 214). From 2015 through 2019, Hunt was assigned to the DEA as a drug task force officer. (*Id.* at p. 215). As a case agent assigned to this case, Hunt was responsible for the investigation and was present at the tow yard when the evidence was gathered from Vazquez's car. (*Id.* at pp. 216-17). A total of five phones were found in the vehicle when Vazquez was pulled over, but one of those phones was crushed and the other disappeared. (*Id.* at pp. 248-49). Hunt explained that the phones were left on the hood of a vehicle and fell off on the highway. (*Id.* at p. 249). From Vazquez's phone, however, Hunt and other agents were able to extract data, including text messages and a contact list, that allowed them to identify other co-conspirators. (*Id.* at p. 219). Vazquez had a contact for "Art Cal" in his phone with a 619 area code. (*Id.* at p. 226).

In the course of the investigation, Hunt interviewed Korn and received consent to search her phone. Korn had a contact entry in her phone with the name Art, which had the same number for "Art Cal" that was contained in Vazquez's phone. (*Id.* at p. 225). That number, however, was not subscribed to Arturo Ledesma, Jr. (*Id.* at p. 226). Instead, it was subscribed to Jose Ramirez with a P.O. Box address in Lenexa, Kansas. (*Id.*). Hunt explained that a P.O. box often indicates a prepaid phone. (*Id.*). Hunt also found a second phone number for Ledesma, with an 831 area

code, from check-in records from the LaQuinta Inn in Phoenix. (*Id.* at p. 227). Investigators received toll records from Sprint for both the 916 and 831 area code phone numbers, but there were no communications between Vazquez and these phone numbers. (*Id.* at p. 235). There were more than 600 calls or text messages between a number that belonged to Inderyas and the 916 phone number. (*Id.* at pp. 237-38). Detective Hunt admitted that Ledesma's co-defendants are the only link between Ledesma and the 619 phone number. (*Id.* at p. 262).

In August 2018, Detective Hunt called the 831 phone number and spoke to a man named "Art." (*Id.* at p. 245). When Detective Hunt told Art he had been implicated in a major drug conspiracy, Art swore he did not know anything or anyone referenced by Detective Hunt. (*Id.* at pp. 245-46; Exs. 49, 50). Detective Hunt testified that when Ledesma was arrested, he had no phone in his possession; therefore, a search was never performed of his phone. (*Id.* at p. 229). Detective Hunt also did not try to wiretap the 831 or 619 phone numbers. (*Id.* at pp. 257-58).

Detective Hunt and his team did not ask the LaQuinta Inn for any security tape, but they did receive two still frame photos purporting to show Ledesma, by himself, at the check-in desk. (*Id.* at p. 253).

Detective Hunt also met with each of the individuals who were cooperating in this case. Detective Hunt did not show Vazquez, Abreu, Inderyas, or Velez a photographic lineup and ask them to identify Ledesma. Instead, he just showed them a photo and asked, "Is this Art?" (*Id.* at pp. 250-51). Korn identified a photo of Arturo Ledesma, Sr., the Defendant's father, as being present at the transaction in Phoenix. (*Id.* at pp. 251-52).

FBI Special Agent Richard Fennern also testified regarding his role with the Cellular Analysis Survey Team (CAST) and used a demonstrative exhibit, which was not admitted as evidence, to explain the general location of several cell phones on May 11, 2018. (*Id.* at p. 273). Agent Fennern testified that he uses data from cell towers to determine the general location of a

cell phone when it communicated with a tower. (*Id.* at pp. 276-77). In this case, he performed an analysis of the 619 phone number to determine that on May 11, 2018, it communicated with a tower in Castroville, California. (*Id.* at p. 289). That phone then moved south to Los Angeles, then Palm Springs, and finally to Phoenix around 3:18 p.m. on May 11, 2018. (*Id.* at p. 290). Similarly, the 831 phone number moved from Castroville, California, to Los Angeles, Palm Springs, and Phoenix. (*Id.*). Agent Fennern testified that these two phones used cell towers that would be consistent with a phone at or near the LaQuinta Inn in Phoenix. (*Id.* at p. 292-93). On May 12, 2018, the 831 number continued north through California, returning to Castroville, California at 8:37 p.m. (*Id.* at p. 297). The 916 number had no communication with any cell towers until May 13, 2018, when it was back in Castroville, California. (*Id.*). Agent Fennern also testified that he reviewed records for both numbers and determined that for 87 days' worth of data, the phones were co-located with each other. (*Id.* at p. 299). That is, on days where both phones had activity, they were located in the same tower and sector area. (*Id.* at pp. 299-300). He acknowledged, however, that this data could be consistent with two people living together. (*Id.* at p. 300).

Finally, Kevin Bauer, an officer with the Glen Carbon Police Department and a case agent with the DEA, testified that he obtained Wells Fargo bank records as part of his investigation in this case. (Doc. 632 at pp. 27-28). Ledesma's bank records from November 28, 2017, showed that Lauren Korn deposited $1,300 into Ledesma's account. (*Id.* at p. 32). And, on January 12, 2018, Korn deposited $400 into Ledesma's account. (*Id.* at p. 33).

The only Defendants charged with conspiracy to distribute marijuana, along with Ledesma, were Dastisha Velez and Jansel Abreu, who remains a fugitive to this day. No evidence was presented that Ledesma had any interaction with Velez other than Vazquez and Velez's trip to California in 2017. Inderyas testified that he was never caught dealing marijuana, so he believed that is why he was not charged with that offense. (Doc. 631 at pp. 36, 50). He did not

know Ledesma had been charged with conspiracy to distribute marijuana. (*Id.*).

At the close of the government's case, on June 6, 2022, defense counsel orally moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Counsel argued that the Government tried to lump any marijuana transactions with the methamphetamine deal in Phoenix into one big conspiracy, but that the evidence showed Inderyas purchased marijuana from Ledesma, and Inderyas along with Korn mailed that marijuana to Pennsylvania. Thus, there was no link between the sale of marijuana in California and the Southern District of Illinois, and that portion of the indictment should be stricken and dismissed. Counsel also argued that venue for the methamphetamine activity should be in Arizona and that the Government failed to establish a submissible conspiracy case.

In response, the Government argued that marijuana was part of the conspiracy, and it did not need to demonstrate that marijuana was found in the Southern District of Illinois to show that the conspiracy occurred in this district. And because the methamphetamine was found in the Southern District of Illinois, this district is the proper venue for the methamphetamine charge. Finally, the Government argued, when viewing the evidence in a light most favorable to the Government, there was more than sufficient evidence to sustain a guilty verdict on both counts.

Ledesma's motion was denied. (Doc. 568). On June 8, 2022, the jury returned a verdict of guilty on Count 1, and a verdict of not guilty on Count 2. (Docs. 577, 579). Ledesma timely renewed his motion following the jury's verdict. (Doc. 584). The Government filed a response in opposition. (Doc. 590).

### MOTION FOR JUDGMENT OF ACQUITTAL NOTWITHSTANDING THE VERDICT

Under Rule 29 of the Federal Rules of Criminal Procedure, a court, on the defendant's motion, must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. FED. R. CRIM. P. 29(a). "A jury verdict will only be overturned 'if, after

viewing the facts in the light most favorable to the government, there was insufficient evidence to convict.'" *United States v. Perryman*, 20 F.4th 1127, 1133 (7th Cir. 2021), *reh'g denied*, No. 20-1453, 2022 WL 273355 (7th Cir. Jan. 28, 2022), and *cert. denied*, 142 S. Ct. 2803 (2022) (quoting *United States v. Jett*, 908 F.3d 252, 273 (7th Cir. 2018)).

When challenging the sufficiency of the evidence, the defendant "bears a heavy, indeed, nearly insurmountable, burden," as the defendant must convince the court that even "after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found him guilty beyond a reasonable doubt." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010). "At the same time, the height of the hurdle depends directly on the strength of the government's evidence, and a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." *United States v. Moreno*, 922 F.3d 787, 793 (7th Cir. 2019) (quotation omitted).

Ledesma argues that, to sustain the charges in this case, the United States was required to prove that, in the Southern District of Illinois and elsewhere, Ledesma conspired and agreed with others to knowingly and intentionally distribute controlled substances, namely methamphetamine and marijuana. Ledesma asserts three reasons why the Government failed to meet its burden: (1) the trial testimony did not show an ongoing conspiracy; (2) any evidence of marijuana sales was irrelevant and improper; and (3) insufficient evidence was presented to demonstrate venue was proper in the Southern District of Illinois.

To prove a conspiracy under 21 U.S.C. § 846, the government must show "(1) two or more people agreed to commit an unlawful act, and (2) the defendant knowingly and intentionally joined in the agreement." *Id.* (quoting *United States v. Maldonado*, 893 F.3d 480, 484 (7th Cir. 2018)). The Government must prove that the defendant implicitly or explicitly agreed with someone else to distribute drugs. *United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010).

When the alleged co-conspirators are in a buyer-seller relationship, however, the Seventh Circuit has "cautioned against conflating the underlying buy-sell agreement with the drug-distribution agreement that is alleged to form the basis of the charged conspiracy. To support a conspiracy conviction, there must be sufficient evidence of an agreement to commit a crime *other than* the crime that consists of the sale itself." *Id.* (quotation omitted); *see also United States v. Pulgar*, 789 F.3d 807, 808 (7th Cir. 2015); *Moreno*, 922 F.3d at 794. "Although every drug deal involves an unlawful agreement to exchange drugs, a buyer-seller arrangement can't by itself be the basis of a conspiracy conviction because there is no common purpose: The buyer's purpose is to buy; the seller's purpose is to sell." *Moreno*, 922 F.3d at 794 (internal quotations omitted).

While the Government can meet its burden by producing evidence that the buyer agreed to resell drugs to a third party, the Government cannot "rely solely on purchases and sales, which after all are present in both buyer-seller and conspiracy arrangements." *Id.* (quoting *United States v. Long*, 748 F.3d 322, 326 (7th Cir. 2014)). Instead, the Government must present additional circumstantial evidence that supports a conspiracy and not just a wholesale buyer-seller relationship, such as: "large-quantity drug sales; repeated or standardized transactions; a lengthy relationship between the parties; sales on credit (*i.e.*, fronting); warnings of threats by competitors or law enforcement; and sharing tools and supplies." *Id.* (citing *Maldonado*, 893 F.3d at 484–85; *Pulgar*, 789 F.3d at 815-16). "[L]arge-quantity, repeat sales alone do not support an inference of conspiracy." *Id.*

"This rule is based on a fundamental principle of criminal law: the requirement that the government prove the defendant guilty beyond a reasonable doubt." *United States v. Johnson*, 592 F.3d 749, 755 (7th Cir. 2010). Where a wholesale buyer-seller arrangement is equally as plausible as a drug-distribution conspiracy, then the jury has to choose between two inferences. *Id.*; *Pulgar*, 789 F.3d at 812. "On one hand, the jury could infer that the purchaser and the supplier conspired

to distribute drugs. On the other hand, the jury could infer that the purchaser was just a repeat wholesale customer of the supplier and that the two had not entered into an agreement to distribute drugs to others. In this situation, the evidence is essentially in equipoise; the plausibility of each inference is about the same, so the jury necessarily would have to entertain a reasonable doubt on the conspiracy charge." *Id.* "Absent some other evidence of a conspiratorial agreement to tip the scales, the jury must acquit." *Id.*

Here, Ledesma contends there was insufficient evidence presented to convict him of a conspiracy. Ledesma asserts that the Government presented evidence about an isolated methamphetamine deal in 2017 in California, after which his co-defendants testified that no further deals were made with him because of the quality of the methamphetamine. The Government then presented evidence that, almost a year later, Ledesma agreed to introduce his co-defendants to a methamphetamine supplier. According to Ledesma's co-defendants, "Art" was the middleman for this sale, which took place in Phoenix, and no further contact was made by any co-defendant with Art after Enrique Vazquez's arrest.

In response, the Government agrees that a conspiracy requires more than a simple buyer-seller relationship; it requires evidence that co-conspirators have agreed to further distribute drugs. The Government submits, however, that the jury had more than enough evidence to reasonably infer that Ledesma was part of a conspiracy to distribute methamphetamine and marijuana with his co-defendants. The Government argues that testimony from Vazquez, Inderyas, Korn, and Velez showed prolonged cooperation between the parties with regard to the distribution of marijuana and methamphetamine from Ledesma to Vazquez through Inderyas and Korn between 2017 and 2018.

Additionally, the evidence submitted at trial showed that: the parties dealt with high quantities of methamphetamine; Ledesma would have known that Vazquez intended to resell

the methamphetamine and marijuana; Ledesma intended to allow Vazquez and Inderyas to contact his methamphetamine source of supply directly for future transactions after their transaction on May 11, 2018; Ledesma repeatedly contacted Inderyas in May 2018 to ensure that the Phoenix methamphetamine deal was going to be completed; and, after his arrest, Vazquez asked Dastisha Velez if she had informed Ledesma of Vazquez's arrest. The Government also contends that Ledesma shared tools of the drug trade during the Phoenix drug transaction when he and others used a vacuum sealer brought by Inderyas to seal the methamphetamine into plastic bags.

The Court agrees with Ledesma that the Government failed to establish, beyond a reasonable doubt, that he was involved in the drug distribution conspiracy as charged in this case. The Government presented evidence through Korn that Inderyas purchased marijuana from Ledesma for years, beginning around 2013. There was no evidence, however, that Ledesma knowingly and intentionally agreed with Inderyas and Vazquez, beginning in 2017, to distribute marijuana across state lines. *See Moreno*, 922 F.3d at 793. Instead, the evidence showed that Vazquez paid Inderyas, Inderyas purchased marijuana from Ledesma, Inderyas and Korn paid Ledesma with Vazquez's money, Inderyas and Korn packaged the marijuana, and Inderyas and Korn mailed it to Pennsylvania.

There also was a lack of circumstantial evidence supporting a marijuana conspiracy. Ledesma did not front the marijuana, there was no pooling of money or other resources, and Ledesma had no stake in Inderyas's or Vazquez's success. *See United States v. Hopper*, 934 F.3d 740, 757 (7th Cir. 2019). There was no evidence that Ledesma even knew Inderyas was buying the marijuana for Vazquez or that Vazquez intended to distribute the marijuana in Pennsylvania. And even if Ledesma knew that Inderyas was buying the marijuana for someone else, that does not make him a co-conspirator with Inderyas and Vazquez. *See United States v. Townse*nd, 924 F.2d

1385, 1397 (7th Cir. 1991) (defendant's knowledge that buyer had extensive drug dealings beyond those in which defendant was involved did not, alone, make him a co-conspirator with relation to those other deals). At best, a wholesale buyer-seller arrangement was equally as plausible as a marijuana-distribution conspiracy, meaning the jury "necessarily would have to entertain a reasonable doubt on the conspiracy charge." *Johnson*, 592 F.3d at 755.

With regard to the methamphetamine, the evidence at trial demonstrated that Ledesma made one sale in 2017 and arranged another, the Phoenix sale, in 2018. Again, the Government failed to produce evidence that the 2017 sale and the Phoenix sale were anything more than wholesale buyer-seller agreements. There is no doubt that the transactions, particularly the Phoenix sale, involved a large quantity of drugs. But "large-quantity, repeat sales alone do not support an inference of conspiracy." *Moreno*, 922 F.3d at 794. There was no prolonged cooperation between the parties or repeated or standardized transactions with regard to the methamphetamine. There was no evidence of fronting any drugs for payment later. *See, e.g.*, *Hopper*, 934 F.3d at 755 ("Evidence of repeated, fronted transactions can be compelling circumstantial evidence of an agreement to distribute drugs because it demonstrates that the defendant had knowingly thrown his lot in with other members of the conspiracy.") (internal quotation marks omitted).

While the Government argues that Ledesma intended to allow Vazquez and Inderyas to contact his methamphetamine source of supply directly for future transactions after their transaction on May 11, 2018, the Court finds this circumstantial evidence to be more suggestive of a buyer-seller agreement than a conspiracy, for there was no evidence that Ledesma would profit off of any future sales or that he would be involved whatsoever. Indeed, Inderyas testified that he intended to cut Ledesma out of future deals.

The Government also points to evidence Ledesma repeatedly contact Inderyas in May

2018 to ensure the Phoenix deal was going to be completed. Phone calls leading up to a transaction, however, are not "[e]vidence of an agreement to advance *further* distribution." *Pulgar*, 789 F.3d at 812. Furthermore, evidence that Vazquez asked Velez if she called Ledesma after he was arrested or told Velez to call Ledesma does not support the existence of Ledesma's agreement to enter a conspiracy. There was no evidence that Ledesma entered an agreement to warn others of threats from law enforcement. *See Maldonado*, 893 F.3d at 485 (agreement to warn of future threats to each other's business from law enforcement can be evidence of a conspiracy). While the Seventh Circuit has held that evidence of a defendant's warning about the police is evidence of his participation in a larger conspiracy, *see, e.g.*, *United States v. Bustamante*, 493 F.3d 879, 886 (7th Cir. 2007), here, the opposite occurred. Vazquez told Velez to call Ledesma, which she never did anyway. And a "singular warning is insufficient to establish the existence of a conspiracy." *Johnson*, 592 F.3d at 757. As the Court of Appeals has said more than once, "[t]his is not conspiratorial behavior; it is self-preservation." *Pulgar*, 789 F.3d at 814 (7th Cir. 2015); *Johnson*, 592 F.3d at 757.

Finally, the Government contends that Ledesma shared tools of the drug trade during the Phoenix drug transaction when he and others used a vacuum sealer brought by Inderyas to seal the methamphetamine into plastic bags. True, the evidence at trial was that Ledesma helped Vazquez, Abreu, and Inderyas package the methamphetamine bags into additional vacuum-sealed bags. But helping to package drugs during a one-time sale is very different from situations where co-conspirators share tools and supplies on a regular basis. For example, in *Moreno*, the defendant shared vehicles with trap compartments used to transport drugs and money with others in the alleged conspiracy. *Moreno*, 922 F3d at 795-96. In *Brown*, a co-conspirator gave the defendant prepaid cell phones and a vehicle with a trap to conceal drugs. *United States v. Brown*, 726 F.3d 993, 1006 (7th Cir. 2013). In *Maldonado*, the defendant also was loaned a vehicle with a

trap compartment. *Maldonado*, 893 F.3d at 485. The shared use of a vacuum sealer during the Phoenix deal is far from evidence, beyond a reasonable doubt, that Ledesma was part of a conspiracy to distribute methamphetamine.

In sum, the evidence submitted at trial, as a whole, was insufficient for a rational jury to find guilt beyond a reasonable doubt on the conspiracy charge, for it was just as likely that a buyer-seller arrangement existed. In that situation, the jury should have acquitted Ledesma on Count 1. For that reason, the Court grants Ledesma's motion and enters judgment of acquittal notwithstanding the verdict.[1]

### MOTION FOR NEW TRIAL

If a court enters a judgment of acquittal after a guilty verdict, Rule 29(d) requires the court to "conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." FED. R. CRIM. P. 29(d)(1).

Under Rule 33, a court may grant a defendant a new trial "if the interest of justice so requires." FED. R. CRIM. P. 33(a); *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989) ("The decision to grant or deny a motion for new trial rests within the sound discretion of the trial court."). Courts have interpreted the Rule 33 standard "to require a new trial in a variety of situations in which trial errors or omissions have jeopardized the defendant's substantial rights." *United States v. Reed*, 986 F.2d 191, 192 (7th Cir. 1993). But a jury verdict in a criminal case is "not to be overturned lightly." *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (citation omitted). A new trial is warranted only in "rare cases in which consideration of the evidence leaves a strong doubt as to the defendant's guilt of the charged offense." *United States v. Peterson*, 823 F.3d 1113, 1122 (7th Cir. 2016) (citation omitted).

---

[1] The Court addresses Ledesma's remaining arguments regarding the relevance of marijuana and proper venue in its discussion on Ledesma's motion for new trial.

*Expert Testimony of Special Agent Richard Fennern*

Ledesma challenges the Court's ruling with regard to Special Agent Richard Fennern's expert testimony regarding cell site data. Citing to case law from the Sixth Circuit, Ledesma first argues that the methodology used by federal law enforcement agencies to estimate the location of a cell phone based on analysis of historical cell site location data is unreliable. Second, he argues, even if Agent Fennern's opinion was reliable, it should have been excluded or limited under Rule 403, as it was highly prejudicial. Ledesma argues there is an unacceptably high risk that a jury of laypersons will assume that the nearest tower is always utilized by a cellular telephone. Third, Ledesma asserts that Agent Fennern's report contained demonstratives that were misleading to the jury, including the cell sites plotted on maps with no explanation of the distances between the towers or the range of those towers, instead relying on the term "general location," which is too vague to provide sufficient guidance to the jury. Finally, Ledesma argues that Agent Fennern's report contained a section that attempted to link the 619 and 831 phone numbers to "common" and "valid" locations—terms that were undefined, misleading, and prejudicial.

In response, the Government notes that the Seventh Circuit has consistently found expert testimony regarding cell site analysis to be sufficiently reliable to admit at trial. Agent Fennern also acknowledged the limits of cell-site analysis and admitted that it can only be used to show a phone's general location. Moreover, the testimony was not unduly prejudicial under Rule 403 when it included a detailed explanation of the scientific basis on which it derived, and an emphasis that the technology could only show a phone's general location, was highly probative in proving Ledesma's participation in the charged conspiracy. Finally, the Government argues, even if the Court erred by not excluding or limiting Agent Fennern's testimony, the error was harmless because the testimony was corroborated by other evidence including witness testimony

from Vazquez, Inderyas, Korn, and Velez, as well as text messages between Inderyas and Vazquez. And, even without this testimony, a rational jury could have convicted Ledesma on the basis of the remaining evidence introduced at trial.

The Court agrees with the Government that it did not err in permitting Agent Fennern to testify and to present his demonstrative exhibit. As the Court explained in its Order denying what it deemed to be a *Daubert* motion filed by Ledesma, the Seventh Circuit has allowed admission of cell site location testimony because of its sufficient reliability that a phone was in a *general* area. *See United States v. Hill*, 818 F.3d 289, 298 (7th Cir. 2016) ("Historical cell-site analysis can show with sufficient reliability that a phone was in a general area, especially in a well-populated one. It shows the cell sites with which the person's cell phone connected, and the science is well understood."). Agent Fennern also fully clarified his methodology to the jury with regard to determining the physical location of a cell tower and the direction of the coverage of that cell tower. (*Id.* at p. 281). Agent Fennern explained that he uses cell phone records to determine the tower and sector identifiers, as well as the general location of the phone when it connected with a tower. (*Id.* at pp. 285-86).

The Court also finds no prejudice in the use of the demonstrative exhibit, as defense counsel cross-examined Agent Fennern extensively regarding the distance between the towers as pictured in the exhibit. Agent Fennern also explained that the data is used to determine the general location of a phone, not the exact location, and that a phone can use two different towers, not necessarily the closest one, when it is in a sector that has overlapping coverage. (Doc. 631 at p. 305-06). Defense counsel even clarified that just because someone connects to a tower doesn't mean that is the closest tower to them, to which Agent Fennern responded, "That's correct." (*Id.* at p. 306). Defense counsel also could have questioned Agent Fennern about the use of the terms "common" and "valid" locations, but chose not to do so.

For these reasons, the Court finds that it did not err in allowing Agent Fennern to testify and present his demonstrative exhibit. Ledesma is not entitled to a new trial on this basis.

*Venue*

Ledesma also argues that the Court made a substantial legal error when it denied his pre-trial motion to dismiss for improper venue, or in the alternative, for a change of venue. (Docs. 469, 523). Ledesma asserts that the Court erred by failing to strike the marijuana provisions of the conspiracy count when proper venue was not established. Venue also was improper because there was insufficient evidence to show that he was involved in a conspiracy that continued into this district. Thus, he was deprived of a fair trial pursuant to the Due Process Clause of the Fifth Amendment.

In response, the Government argues that the evidence at trial showed Ledesma engaged in a conspiracy with his co-defendants to distribute marijuana and methamphetamine. In furtherance of that conspiracy, Vazquez and Abreu transported methamphetamine to the Southern District of Illinois, where they were arrested. Thus, venue is indisputably proper in this district.

At the time the Court decided Ledesma's motion to dismiss for improper venue, it was unclear whether the Government would be pursuing a conspiracy conviction based on the alleged marijuana transactions. Ledesma's motion mentioned it as an aside: "If the government is alleging marijuana transactions, those occurred in California as well." (Doc. 469 at p. 5). The Government referenced the marijuana transactions in its summary of the expected evidence at trial, but it did not discuss the marijuana transactions in its discussion of proper venue. In reply, Ledesma noted that, based on the discovery in the case, any evidence supporting a marijuana conspiracy was based on hearsay from his co-defendants and appeared to be a completely separate transaction. Even if the marijuana dealings were to be considered a separate conspiracy,

it would not have any connection to the Southern District of Illinois.

In its Order denying Ledesma's motion to dismiss for improper venue, the Court failed to appreciate Ledesma's arguments with regard to the alleged marijuana transactions. Partially, this was because the Court was confined to accepting the allegations in the Superseding Indictment and the Government's brief as true. And the Government alleged that the evidence at trial would show that Inderyas, Korn, and Ledesma "worked together to distribute marijuana to Enrique Vazquez from California to Pennsylvania through the mail."

At trial, however, the evidence showed that Inderyas purchased marijuana from Ledesma in California, Inderyas and Korn paid Ledesma in California, and then Inderyas and Korn shipped that marijuana from California to Pennsylvania. Any activity involving Ledesma and marijuana, including Korn's two wire transfers from her Wells Fargo account to Ledesma's account, was confined to the state of California. Ledesma renewed this argument at the close of the Government's evidence and asked the Court to strike the marijuana charge from the indictment. The Court again failed to appreciate the significance of Ledesma's arguments, and that was a mistake.

"Courts determine whether venue is proper by considering 'the nature of the crime alleged and the location of the act or acts constituting it.'" *United States v. Firtash*, 392 F. Supp. 3d 872, 880 (N.D. Ill. 2019) (quoting *United States v. Clark*, 728 F.3d 622, 623–24 (7th Cir. 2013)). Conspiracy is a "continuing crime," which means it can be charged anywhere the conspiracy "was begun, continued, or completed." *United States v. Spraggins*, No. 1:19-CR-00821, 2021 WL 4264418, at *6 (N.D. Ill. Sept. 20, 2021) (quoting 18 U.S.C. § 3237(a)). Thus, the Seventh Circuit has held that venue is proper in conspiracy cases in "any district in which an overt act of the conspiracy occurred," even if there is no evidence that the defendant ever entered that district or

that the conspiracy was formed there. *Firtash*, 392 F. Supp 3d at 880 (quoting *United States v. Ochoa*, 229 F.3d 631, 636–37 (7th Cir. 2000)).

Here, as discussed above, the Government failed to produce evidence that Ledesma knowingly and intentionally agreed with Inderyas and Vazquez, beginning in 2017, to distribute marijuana across state lines. Based on Inderyas's testimony, Ledesma sold the marijuana to him, and he paid Ledesma for it—all of which occurred in California. No marijuana was found in the vehicle driven by Vazquez and Abreu that was pulled over in the Southern District of Illinois, and none of Ledesma's co-defendants, *i.e.*, Vazquez, Inderyas, or Korn, were charged with conspiracy to distribute marijuana. The lack of evidence connecting Ledesma and any alleged marijuana transactions to the Southern District of Illinois means that venue was not proper here.

Accordingly, if the Court's judgment of acquittal is later vacated or reversed, the undersigned finds that the reference to marijuana should be stricken from the indictment, and Ledesma should be granted a new trial.

### CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendant Ledesma's Motion for Judgment of Acquittal Notwithstanding the Verdict or in the Alternative Motion for New Trial (Doc. 548) and **DIRECTS** the Clerk of Court to enter a Judgment of Acquittal on all counts of the Superseding Indictment. If that judgment is later vacated or reversed, the Court finds that Ledesma should be granted a new trial on Count 1.

**IT IS SO ORDERED.**

**DATED:   November 30, 2022**

*Nancy J. Rosenstengel*
_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**